UNITED STATES DISTRICT COURT
EASTERN DIVISION OF MISSOURI
EASTERN DIVISION

PENNY JOHNSON,                    )
                                  )
          Plaintiff,              )
                                  )     No.  4:06CV01199 SNL
                                  )                    (FRB)
v.                                )
                                  )
                                  )
MICHAEL J. ASTRUE,                )
Commissioner of Social Security,[1] )
                                  )
          Respondent.             )


**REPORT AND RECOMMENDATION OF
UNITED STATES MAGISTRATE JUDGE**


        This matter is on appeal for review of an adverse ruling by the Social Security Administration.  All pretrial matters were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) for appropriate disposition.

**I.  Procedural Background**

        On April 2, 2004, Penny Johnson ("plaintiff") filed an application for a period of disability and disability benefits pursuant to Title II of the Social Security Act, alleging disability as of February 24, 2003 due to uneven pelvic bones, spine curvature, and upper/lower back problems.  (Tr. 62-64; 106.)

---

[1]Michael J. Astrue became the Commissioner of Social Security on February 12, 2007. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, he shall be substituted for Acting Commissioner Linda S. McMahon, and former Commissioner Jo Anne B. Barnhart, as defendant in this suit.  No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Plaintiff's initial application was denied on June 8, 2004, and on June 16, 2004, plaintiff filed a request for a hearing before an administrative law judge ("ALJ"). (Tr. 35-39, 34.) A second request for a hearing before an ALJ was filed by plaintiff's attorney, Dennis W. Fox, on July 14, 2004. (Tr. 28.) On January 10, 2005, a hearing was held before ALJ Julian Cosentino. (Tr. 327-46.) On March 22, 2005, the ALJ issued his decision denying plaintiff's application for benefits. (Tr. 13-20.)

On May 23, 2005, plaintiff filed a Request for Review of Hearing Decision with defendant Agency's Appeals Council. (Tr. 9.) The Appeals Council reviewed additional exhibits; namely, a letter from plaintiff's attorney dated August 9, 2005; a physical residual functional capacity questionnaire by Dr. Barry I. Feinberg;[2] and a letter from plaintiff dated June 15, 2006. (Tr. 2, 315-26.) The Appeals Council considered this additional evidence and denied plaintiff's request for review on July 10, 2006. (Tr. 3-5.) The ALJ's decision thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

---

[2]For the sake of consistency, Dr. Feinberg's physical residual functional capacity questionnaire will be included in the following summary of the medical records. In addition, the undersigned notes that, although the Appeals Council's Exhibit List notes the date of Dr. Feinberg's report as August 12, 2005, the report is actually dated September 12, 2005. See (Tr. 2, 325.) The undersigned concludes that this is a harmless typographical error. See Quaite v. Barnhart, 312 F. Supp. 2d 1195, 1199-1200 (E.D. Mo. 2004) (whether misstatement is typographical error is to be determined by reading misstatement in context of entire opinion.) The undersigned further notes that neither party notes or challenges this error.

A.  Testimony of Plaintiff

At the hearing on January 10, 2005, plaintiff responded to questions from the ALJ and her attorney.  (Tr. 329-46.) Plaintiff is forty-six years old.  (Tr. 330.)  She completed the eleventh grade of high school, and earned a GED.  Id.  She is right handed.  (Tr. 331.)  Plaintiff is married and lives with her husband, who works for GKN Aerospace.  (Tr. 339.)  Plaintiff was previously married, and has a sixteen-year-old daughter from that marriage who lives with plaintiff's former husband.  Id.

Plaintiff was last employed by Ford Motor Company, where she had spent three years working on the assembly line.  (Tr. 331.) Before working for Ford, plaintiff had spent ten years working for Boeing, doing hand assembly/fabrication work, which involved using tools to smooth the edges of small parts.  (Tr. 331-32.)  During her tenure with Boeing, plaintiff was laid off and rehired several times.  (Tr. 332.)  While laid off, plaintiff worked at a trophy/awards company, and a lighting company.  Id.  Plaintiff testified that she was ultimately contacted by Ford and accepted that position to avoid the repeated lay-offs she had experienced at Boeing.  Id.

Plaintiff testified that she stopped working for Ford on February 24, 2003 because she was injured.[3]  (Tr. 333.)  Plaintiff

_____

[3]In her Disability Report, plaintiff indicated that she stopped working on February 24, 2003 because: "I was fired.  The company said it was for misconduct.  I needed to see the doctor because I couldn't walk and the company only had available the time the doctor was on vacation."  (Tr. 106.)

attributed her injury to a problem involving a female co-worker. (Tr. 333-34.) Plaintiff testified that, over a period of eight months, this co-worker would leave her own work area and enter plaintiff's, stand in plaintiff's way, and talk on her cell phone for ten hours per day. (Tr. 333.) This behavior forced plaintiff to run up the assembly line to catch the vehicle she needed to work on, and to otherwise maneuver her body uncomfortably to dodge the co-worker. Id. Plaintiff testified that these movements "overworked" her body, and that she experienced sudden, terrible pain on both sides of her pelvic area. Id.

Plaintiff testified that she visited the company nurse and company doctor, both of whom mis-diagnosed her. Id. Plaintiff then obtained her own doctor through her family physician, who diagnosed stress fractures in her pelvic bones. (Tr. 333-34.) Plaintiff testified that this doctor performed x-rays, which ruled out osteoporosis and bone density problems. (Tr. 334.) Plaintiff testified that she was prescribed rest and physical therapy, but failed to improve. (Tr. 335.) Plaintiff testified that she requested additional physical therapy, but her requests were denied. Id.

Following the stress fracture tests, plaintiff returned to work, and was assigned a job which mainly required sitting. Id. Plaintiff was able to perform this job because she could remain seated, and was free to change positions as needed. Id. After two weeks, however, she was returned to the assembly line. (Tr. 335.)

-4-

Plaintiff returned to the doctor to ask for time off due to pain and an inability to walk, and further testified that she was unable to stand, sit or walk for very long. <u>Id.</u> At the time of the hearing, plaintiff was pursuing workman's compensation benefits from Ford. (Tr. 344.)

Plaintiff testified that she suffered pain after walking and that, if she were to go to the mall, she could visit only two stores before needing to return home. (Tr. 336.) Plaintiff testified that she had pain in the area of her buttocks and in the sides of her legs that radiated down to her knees, and slightly below. <u>Id.</u> Plaintiff stated that, if she overworked herself, she also experienced this pain in the front of her legs. <u>Id.</u> Plaintiff testified that two doctors informed her that nothing further could be done about this pain. <u>Id.</u> Past efforts to control her pain included deep massage and leg stretches, along with pain medication. (Tr. 338.) Prior to seeing Dr. Feinberg, plaintiff underwent steroid injections which yielded no improvement. <u>Id.</u> Plaintiff testified that she still occasionally takes Tramadol,[4] but tries to avoid it due to side effects.[5] <u>Id.</u> Plaintiff is taking no other pain medication. <u>Id.</u> Plaintiff has

---

[4]Tramadol is indicated for use in the treatment of moderate to moderately severe pain. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a695011.html

[5]The record indicates that plaintiff reported to the vocational counselors at MERS/Goodwill that Tramadol caused no side effects. (Tr. 145.)

taken Nortriptyline[6] for depression in the past, but not recently. (Tr. 338.)

Regarding her daily activities, plaintiff testified that she cooked lunch and put dishes in the dishwasher, and then, depending upon how she felt, alternated between performing household chores and resting. (Tr. 340.) Plaintiff testified that she went grocery shopping every two to three weeks. Id. Plaintiff spends about 30 minutes grocery shopping, and most recently had to use one of the store's wheelchairs. (Tr. 341.) Plaintiff is able to carry heavier grocery bags, but stated that, if she were to go grocery shopping and then bring the bags into the house, that would be all the activity she could perform for "awhile." Id. Plaintiff is able to lift her vacuum cleaner. Id. When asked whether she is able to drive, plaintiff testified that she must drive a van because sitting in a car caused discomfort. (Tr. 342.)

Plaintiff is able to sit for only 30 to 60 minutes at a time, and must change positions during this time. Id. When sitting or standing, plaintiff experiences pain in her pelvic area, and when standing, she feels pain radiating down her legs. Id. Plaintiff testified that she hurt just as much when lying down, and that she required a pillow to support her right leg, but still felt pain in this position. (Tr. 342-43.)

Once per week, plaintiff visits a friend in his home for

---

[6]Nortriptyline is indicated for use in the treatment of depression. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682620.html

approximately one hour. (Tr. 343.) Plaintiff also visits her daughter, who lives one hour away, and they may visit one store together. Id. Plaintiff visits her parents once per month, but did not specify the distance traveled or the duration of these visits. Id. Plaintiff is not involved in group or church activities. Id. Plaintiff occasionally uses a cane. (Tr. 343.)

Plaintiff was then questioned by her attorney. (Tr. 344.) She testified that she participated in a vocational rehabilitation program for about one month, but was told that there was nothing they could do for her. (Tr. 344-45.)

B.  Medical Records

The record indicates that plaintiff was seen by Dr. Thomas Albus on August 22, 2002 with complaints of pelvic pain of unknown etiology. (Tr. 299.) Plaintiff's medical history was positive for uterine cancer. (Tr. 300.) It is noted that plaintiff was taking Naproxen.[7] Id. Physical exam revealed no leg length discrepancy, and was negative for objective findings. Id. Dr. Albus diagnosed plaintiff with pelvic pain of unknown etiology and noted that, absent evidence of significant musculoskeletal abnormality, plaintiff should continue in physical therapy and should see Dr. Bernard C. Randolph, an orthopedist. Id.

Plaintiff saw Dr. Randolph for a consultative examination

---

[7]Naproxen, also called Naprosyn, is used to relieve pain, tenderness, swelling, and stiffness caused by arthritis.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a681029.html

on September 3, 2002, with complaints of persistent, moderately severe pain that increased with activities such as standing, walking, and bending forward. (Tr. 295-97.) Dr. Randolph noted that plaintiff used a cane, but was able to walk without it. (Tr. 296.) Dr. Randolph obtained pelvic and right hip films which revealed findings within normal limits, and further noted that films from October and December of 2001 were also within normal limits. Id. Dr. Randolph diagnosed plaintiff with non-specific pelvic pain, and recommended she continue physical therapy. Id. Plaintiff saw Dr. Randolph again on September 24, 2002, and reported that her pain had diminished and that she was walking without a cane. (Tr. 294.) Plaintiff's physical exam was essentially normal, and Dr. Randolph indicated a diagnosis of pelvic pain and strain injury to the groin muscle groups. Id.

The record indicates that plaintiff saw Dr. Frank M. Chow, M.D., from January 2003 to March 4, 2003. (Tr. 245-46.)[8] Plaintiff complained of bilateral hip pain exacerbated by walking or standing, but improved by sitting. (Tr. 246.) The records indicate that plaintiff was diagnosed with a groin strain, advised to take ibuprofen, and was excused from work from January 17 through January 26. Id. Dr. Chow noted that other physicians who had seen plaintiff had indicated that "no obvious pathological

_____

[8]Included in the records of Dr. Chow is a radiological report pertaining to a patient other than plaintiff. (Tr. 247.) Neither plaintiff nor defendant cite this report, or otherwise erroneously assume that it pertains to plaintiff.

etiology can be found for her severe hip pain." Id. Dr. Chow further notes that a May 2002 MRI was negative, and found plaintiff to be in "no apparent distress" upon physical exam. Id. Dr. Chow ordered an x-ray of plaintiff's bilateral hips, which was performed on March 10, 2003, and revealed no evidence of fracture or dislocation. (Tr. 245, 248.)

Dr. Chow referred plaintiff to Dr. Linda Hunt, whom plaintiff saw on February 21, 2003. (Tr. 310.) Plaintiff gave a history of chronic pelvic pain, which she attributed to her work at Ford Motor Company. Id. Dr. Hunt noted that plaintiff's medical history showed normal findings upon radiological evaluations such as x-ray and bone scan, and also revealed normal findings upon physical examinations. Id. Dr. Hunt further noted that there was no evidence of an underlying connective tissue process to explain plaintiff's problems. Id. Dr. Hunt noted that plaintiff had a list of conditions she was concerned she had, including avascular necrosis of the hip. (Tr. 310.) Dr. Hunt noted that she explained to plaintiff that this had been ruled out via x-ray. Id. Dr. Hunt assessed chronic right pelvic pain, advised plaintiff to take Naprosyn as needed, and did not schedule any follow-up care. Id.

Dr. Chow also referred plaintiff to Dr. James C. Strickland, whom plaintiff saw on February 26, 2003 for a consultative examination. (Tr. 292-93.) Plaintiff gave a history of being diagnosed with pelvic stress fractures in 2001 by Dr. Jacques VanRyn. (Tr. 292.) Dr. Strickland's note indicates that

he reviewed x-rays, including a pelvic bone scan presented to him by plaintiff, and that he noted plaintiff's prior diagnosis of "stress phenomena or a stress fracture" of the pelvis. Id. Dr. Strickland obtained x-rays of plaintiff's pelvis and noted that they revealed some increased bone density bilaterally, which would indicate a healing stress fracture. (Tr. 293.) Plaintiff's physical examination was normal. (Tr. 292.) Dr. Strickland ordered a bone density examination to rule out pubic stress fractures and osteoporosis. (Tr. 292-93.)

On March 7, 2003, Dr. Strickland spoke to plaintiff via telephone and informed her that her bone density evaluation showed a small area of interest on the right hip. (Tr. 291.) Plaintiff, however, stated that her pain went back and forth, and was at that moment present mainly on the left. Id. Dr. Strickland indicated that he was therefore unsure what was causing plaintiff's problems, and recommended she continue on hip strengthening exercises and follow up with him in three weeks. Id.

Plaintiff returned to Dr. Strickland on March 24, 2003 with complaints of intermittent aching in both hips that varied from side to side. (Tr. 290.) Dr. Strickland noted a normal range of motion, and again indicated that plaintiff's examination and all of her studies revealed no explanation for plaintiff's hip pain. Id.

On April 11, 2003, plaintiff saw Dr. John Garcia, M.D., a resident physician, along with Dr. Robert E. Burdge, M.D., an

attending physician, at St. Louis University Health Sciences Center, Department of Orthopedic Surgery, with complaints of hip and groin pain. (Tr. 284-85.) Plaintiff gave a history of a stress fracture in August of 2001, and stated that she had since experienced chronic pain and weakness after prolonged walking. (Tr. 284.) Her medical history was positive for uterine cancer which was removed in 1982, and hernia repair. Id. She was noted to be taking Vioxx,[9] Naprosyn, and "shots in the past" (which Dr. Garcia thought were most likely trigger point injections) and Darvocet.[10] Id.

Upon physical examination, Dr. Garcia noted that plaintiff had a slight limp, favoring the right leg. Id. Plaintiff had "good" range of motion, but had pain on the medial groin area with extremes of abduction and extension of the thigh. (Tr. 284.) Plaintiff had 5/5 strength in her quads and hamstrings, her dorsi-flexion and plantar flexion were 5/5, and she had no SI joint tenderness. Id. Dr. Garcia reviewed the bone scan and x-rays taken in March 2003. (Tr. 285.) Dr. Garcia noted that the x-rays showed no abnormalities, and that he was unable to see evidence of a stress fracture. Id. He further noted, as did Dr. Strickland, that plaintiff's bone scan showed some increased

---

[9]Vioxx is used to relieve the pain, tenderness, inflammation, and stiffness caused by arthritis, and to treat painful menstrual periods and pain from other causes.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a699046.html

[10]Darvocet is used to relieve mild to moderate pain.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682325.html

activity on the right side.  Id.  Dr. Garcia assessed hip/groin pain secondary to tendonitis, ordered an MRI, continued plaintiff on Naprosyn, and instructed her to return in three to four weeks. Id.

Plaintiff returned to St. Louis University on June 18, 2003, and was seen by resident physician Victoria Kubik, M.D., along with Dr. Burdge.  (Tr. 282-83.)  Plaintiff reported no improvement in her symptoms, despite a three-week course of Naprosyn and limitations on her activities.  (Tr. 282.)  Plaintiff had pain to palpation of the lateral portions in her pubic area bilaterally, pain with restricted flexion of her hips, and minimal pain with extremes of internal and external rotation.  Id. Plaintiff was able to fully flex and extend her hips.  Id.  Dr. Kubik reviewed the MRI study of plaintiff's pelvis and both lower extremities, obtained on April 30, 2003, which were negative.  Id. Dr. Kubik diagnosed bilateral medial pelvic/groin pain, and stated that, although there was no clear etiology for plaintiff's pain, it appeared to be muscular in origin given that all of her bony tests had been negative.  (Tr. 282.)  Plaintiff was instructed to continue taking anti-inflammatory medication, and return in six weeks after completing a course of physical therapy.  Id.

The record indicates that plaintiff presented to HealthSouth for physical therapy from June 25, 2003 through August 27, 2003 with physical therapist Michelle Boatwright.  (Tr. 254-277.)  On June 25, 2003, plaintiff complained of pain in the

-12-

anterior pelvic region that worsened with walking, sitting for 15 minutes, and standing for approximately five minutes. (Tr. 275.) Plaintiff reported difficulty falling asleep, stated that her pain was generally worsening, and that it was particularly bad preceding her menstrual cycle. Id. Plaintiff stated that she felt she suffered stress fractures of her pelvis at her job, either from twisting or walking on a concrete floor. Id. Upon exam, Ms. Boatwright noted that plaintiff's pubic alignment was slightly elevated on the right. (Tr. 275, 277.) Plaintiff had only mildly limited lumbar range of motion, and a positive standing flexion test on the right. (Tr. 275.) Plaintiff was noted to be wearing a leg lift on the right. Id. Plaintiff's reflexes and sensation were equal and intact bilaterally. Id.

On June 30, 2003, plaintiff presented to the St. Louis University Hospital ("SLUH") physical therapy department with complaints of continued bilateral pelvis and groin pain, and underwent isokinetic testing of her bilateral hips. (Tr. 280.) She reported increased pain following treatment. Id.

Plaintiff returned to HealthSouth for physical therapy on July 2, 2003 with the same subjective complaints, and reported that the isokinetic testing of her bilateral hips at SLUH had not been helpful. (Tr. 274.) On July 7, 2003, plaintiff presented again to HealthSouth with the same complaints, and again stated that the last physical therapy session had increased her symptoms. (Tr. 273.) Ms. Boatwright noted that plaintiff tolerated the current

-13-

visit better than the preceding visit.  Id.  On July 9 and July 11, however, plaintiff reported continued soreness, but some improvement with therapy.  (Tr. 269-71.)  On July 14, 2003, plaintiff reported significant pain in her right groin with little change in therapy.  (Tr. 267.)  On July 16, 2003, plaintiff reported "steadily increasing" right groin pain, especially with walking, and was noted to have a positive Fabere test.[11]  (Tr. 265.) Plaintiff did report decreased pain after therapy, the Fabere's test was repeated, and she was noted to be able to proceed further through the range of motion before experiencing pain.  Id.  The record indicates that plaintiff continued to present to HealthSouth for regular physical therapy appointments through August 27, 2003, and consistently reported continued hip and groin pain with only temporary relief following physical therapy.  (Tr. 254-64.)  The records further indicate that Ms. Boatwright recommended that plaintiff begin a pain management program.  (Tr. 255.)

On July 30, 2003, plaintiff returned to Dr. Burdge's office and was seen by resident physician Jeff Whiting, M.D.  (Tr. 279.)  Plaintiff reported continued "muscular-type pain" around both hips in the hip flexion, extension and abduction regions, and reported that physical therapy was not helping.  Id.  Dr. Whiting noted plaintiff's isokinetic testing of her bilateral hips at SLUH, and interpreted those results as showing that plaintiff actually

---

[11]Fabere's test, also called Patrick's test, is used to detect pathology in the hip.  http://www.med.ufl.edu/rheum/rheumTests.htm#patrick

had increased strength on her more involved side than on the other. (Tr. 279-80.) Dr. Whiting further noted that an MRI revealed no bony or muscular problems, or other major deficits. (Tr. 279.) Upon physical exam, Dr. Whiting noted that plaintiff had full range of motion of both hips, but that she complained of pain to palpation around the areas of both hips. Id. Dr. Whiting assessed bilateral pelvic/groin pain of unknown etiology. (Tr. 279.)

The record indicates that plaintiff saw Dr. Eckert of the Chambers Medical Group, Inc., on five occasions from July 10, 2003 through November 20, 2003, with complaints related to cold symptoms and hip pain, but there is no indication that Dr. Eckert treated any condition other than cold symptoms. (Tr. 252-53.)

Records from Dr. Barry I. Feinberg, M.D., of Injury Specialists, indicate that plaintiff was seen for an initial evaluation on October 30, 2003, and that she had been referred by the physical therapist at HealthSouth. (Tr. 164-67.) Plaintiff complained of constant pain in her pelvic region, bilaterally but worse on the right, and stated that the pain was concentrated under her buttocks and radiated down the medial aspect of her right leg and into the posterior aspect of her knee. (Tr. 164.) Plaintiff stated that her pain was exacerbated by walking, standing, or sitting. Id. She gave a history of an August 2001 stress fracture which had since healed, but stated that her pain nevertheless persisted. Id. Plaintiff gave a history of working for Ford, and stated she believed her injury occurred there because, due to the

actions of a co-worker, she had to constantly move quickly and twist her body. Id. Plaintiff further reported that she was currently "laid off" from Ford. (Tr. 165.) Plaintiff stated that she took no medications other than aspirin. Id.

Dr. Feinberg reviewed plaintiff's medical records, including a hip MRI dated May 31, 2002 which was unremarkable; a bone scan dated March 4, 2003 which revealed a focal area of abnormally increased activity corresponding with the right hip; and bone density testing of this same date which revealed a mild increased risk of fracture in the hip. (Tr. 166.) In addition, a total body scan performed on this same date revealed essentially negative findings, with no abnormal activity seen involving the pelvis. (Tr. 304.)

Upon physical exam, Dr. Feinberg noted that plaintiff was in no apparent distress, and moved on and off the examination table without difficulty. (Tr. 167.) Plaintiff was tender to palpation in her dorsal sacroiliac and gluteal areas, as well as her lumbar area, where spasm was noted. Id. Straight leg raise was negative bilaterally, and there were no areas of atrophy, hypertrophy, or swelling. Id. Femoral stretch test was positive on the right side. Id. Dr. Feinberg's impression was sacroilitis, pelvic pain, lumbar plexopathy, low back syndrome, spondylitic changes in the lumbar spine without myelopathy, and thoracic spinal pain, non-vertebrogenic and non-discogenic. (Tr. 167.) Dr. Feinberg recommended plaintiff begin physical therapy, and consider the

possibility of localized injection therapy.  Id.

Plaintiff underwent physical therapy in Dr. Feinberg's office from November 2003 through May 2004, during which she consistently complained of pain in her pelvic/groin area.  (Tr. 172-216.)  On March 24, 2004, plaintiff complained of pain in her left pubic area and in her low back, but it is noted that her pain was improving.  (Tr. 188.)  Plaintiff underwent bioelectric stimulation on November 11, 2003, and underwent a median branch nerve block on November 18, 2003, at which time she was observed to be using a cane.  (Tr. 162-63.)  Plaintiff underwent another median branch nerve block on December 3, 2003, and a Psoas[12] compartment block on December 10, 2003.  (Tr. 158-59.)  Dr. Feinberg examined plaintiff on December 17, 2003, at which time plaintiff rated her pelvic pain as 2/10 and her low back pain at 5/10.  (Tr. 158.) Plaintiff reported being compliant with her home exercise program, and noted that her activities of daily living were becoming more tolerable and that she was more active, but that she remained off work.  Id.  Plaintiff was not using a cane.  Id.  Plaintiff underwent a median branch nerve block, which yielded an improvement in her low back pain.  Id.  She was instructed to continue physical therapy and her home exercise program.  (Tr. 158.)

Plaintiff was seen again by Dr. Feinberg on January 14,

_____

[12]Psoas refers to either of two internal muscles of the loin; psoas major and psoas minor.
http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=psoas

2004, and reported right pelvic pain at a 5-6/10, and low back pain at a 2/10. (Tr. 157.) Plaintiff reported experiencing increased right pelvic pain following a walk on uneven ground, and that she was unable to perform her home exercises or activities of daily living. Id. Plaintiff reported that she was continually interviewing for jobs despite the fact that her lack of experience in sedentary work was an impediment. Id. Dr. Feinberg noted that plaintiff's ability to bear weight had improved, and that she walked without a cane. Id. Dr. Feinberg recommended plaintiff continue physical therapy and her home exercise program, and noted: "Patient is continuing to look for a job to be cleared to return back to work." (Tr. 157.)

Plaintiff returned to Dr. Feinberg on January 19, 2004, and reported severe right pelvic pain, and insomnia. (Tr. 156.) Plaintiff was markedly tender over her right ilioinguinal ligament. Id. Dr. Feinberg administered a right genitofemoral nerve block, continued plaintiff on physical therapy, and updated her home exercise program. Id.

On February 9, 2004, Dr. Feinberg gave plaintiff a work restriction note which indicated plaintiff must not lift over 25 pounds or climb stairs, and must be able to change positions hourly. (Tr. 155.) On February 25, 2004, Dr. Feinberg made the following notation:

> Chief complaint is pain level in the right
> groin, 6/10. Patient was last seen back in
> January and stopped her physical therapy

-18-

> because of financial issues. Patient states
> the copays were too much. Patient has been
> looking for a job. Patient states she has
> had difficulty getting employment, and was in
> today to discuss the possibility of permanency
> including prognosis and possible restrictions.
> Lengthy discussion was held with patient, and
> patient was told to find a sedentary job and
> possibly consider to be retrained. Patient is
> considering that.

(Tr. 154.)

Upon examination, Dr. Feinberg noted that plaintiff was able to walk without assistance, but had a marked inability to weight-bear on her right lower extremity. Id. Dr. Feinberg noted that plaintiff was to follow-up on an as-needed basis, and prescribed a handicapped parking spot for plaintiff to use as needed. Id.

Plaintiff returned to Dr. Feinberg on March 17, 2004 with complaints of pain in her pelvis and low back. (Tr. 153.) Plaintiff reported that her pelvic pain was exacerbated by weight bearing or prolonged positioning, and also reported insomnia. Id. Plaintiff reported trying to return to the work force, but was unable to perform jobs requiring constant standing and was seeking vocational rehabilitation. Id. Dr. Feinberg continued plaintiff in physical therapy, updated her home exercise program, and indicated that plaintiff was to undergo re-training for vocational skills for employment. Id. Dr. Feinberg administered bioelectric stimulation on March 24, 2004, continued plaintiff on physical therapy and home exercise, and again indicated that plaintiff was

to be re-trained to start back to work.  (Tr. 152.)

Finally, on May 5, 2004, plaintiff saw Dr. Feinberg with complaints of left-sided pubic pain, 4/10 which increased to an 8/10 depending upon her activity level.  (Tr. 151.)  Upon examination, Dr. Feinberg found that plaintiff's pelvis was more balanced and that she had improved paravertebral muscle function, but found some residual dysfunction in the sacroiliac region, significant tenderness in the right pubic area, and muscle weakness in the paravertebral muscles.  Id.  Plaintiff's psoas were still involved but had improved.  Id.  Plaintiff reported experiencing difficulty with job placement due to her inability to work for over two hours.  Id.  Dr. Feinberg noted as follows:

> Patient will be discharged today from physical therapy as no significant improvement has been made and patient feels that it has not been helpful.  Patient, however, objectively appears to be better although this does not seem to coincide with patient's subjective complaints.  Therefore, I do not believe that further therapy would be indicated.  Patient was discharged and will follow up with me on a prn basis.

(Tr. 151.)

Dr. Feinberg completed a work capability form on March 17, 2004.  (Tr. 168-69.)  Therein, Dr. Feinberg limited plaintiff's lifting and carrying to 20 pounds, and opined plaintiff should not sit, stand and/or walk more than two hours at a time.  (Tr. 168.) Dr. Feinberg opined that plaintiff should never climb, kneel, crouch, crawl, squat, or twist, and indicated "no limit or

restrictions" relative to plaintiff's fine and gross manipulative abilities, or her ability to reach, finger or feel. (Tr. 169.) Dr. Feinberg did, however, state that he believed plaintiff was able to work. Id.

A May 7, 2004 vocational evaluation report from MERS/Missouri Goodwill Industries indicates that Plaintiff underwent vocational evaluation, testing, and cognitive/behavioral assessment there. (Tr. 143-49.) The report indicates that plaintiff was always punctual, but was observed to change positions often and frequently leave early with complaints of pain. (Tr. 144.) Plaintiff reported taking Tramadol and sleeping pills, and reported no side effects from these medications. (Tr. 145.) Plaintiff reported experiencing daily pain, and that on some days the pain was very intense. (Tr. 144-45.) Plaintiff stated that it took her several days to recover from a day of intense pain. Id. The ultimate conclusion was that plaintiff may be capable of working as a light assembly worker, small products packager, security monitor, or tray line attendant, but that, because she reported an inability to work longer than two hours, and because most part-time work required at least four-hour shifts, she may have difficulty securing employment. (Tr. 144.)

Records from the Forest Park Medical Clinic indicate that plaintiff saw Dr. Jack C. Tippett, M.D. on May 24, 2004. (Tr. 137-41.) Plaintiff reported bilateral groin pain over the past three years, exacerbated by standing or sitting. (Tr. 137-38.) Dr.

Tippett noted plaintiff's medical history, including her diagnosis of stress fractures of the pubic bones and the treatment of her symptoms. (Tr. 137.) Dr. Tippett noted that, although enough time had elapsed that plaintiff's fractures should have healed, she still complained of pain exacerbated by standing and sitting. Id. Upon examination, Dr. Tippett found that plaintiff limped on her left side and leaned to the left as she walked, but that she did not require a cane to walk. Id. Plaintiff was able to stand on her toes and heels, squat, bend forward and touch her toes, dress and undress herself, and get on and off the examination table unassisted. Id. Plaintiff's back was noted to be normal with minimal tenderness, and plaintiff was able to tilt 25 degrees to the left and right. (Tr. 138.) Examination of plaintiff's hips revealed that they were stable, with normal range of motion with resistance upon external rotation motions of both hips. Id. Plaintiff was mildly tender to palpation over the anterior portion of her pubic bones bilaterally. Id. Dr. Tippett noted that plaintiff had full range of motion of her shoulders and elbows, as well as full range of motion of her hips, and her cervical and lumbar spine. (Tr. 140-41.) X-rays taken at the Clinic on May 20, 2004 revealed normal joint spaces and a normal configuration of the pelvic bones, and no evidence of fracture. (Tr. 139.) Dr. Tippett diagnosed plaintiff with a history of stress fractures of the pubic bones with unexplained continued symptoms following healing. (Tr. 138.)

On September 12, 2005, Dr. Feinberg completed a physical residual functional capacity questionnaire. (Tr. 321-25.) Therein, he indicated that plaintiff's symptoms included constant, moderate to severe left low back pain with radiation to the left mid and left upper back and left neck. (Tr. 321.) Dr. Feinberg indicated his diagnosis as lumbar spondylosis, but noted that plaintiff was neither undergoing active medical treatment nor taking any prescription medications. Id. Dr. Feinberg indicated that plaintiff's pain or other symptoms would "frequently" interfere with her ability to concentrate, and opined that she was incapable of even low stress jobs. (Tr. 322.) Dr. Feinberg indicated that plaintiff could sit for 15 minutes, and could sit and stand or walk less than two hours in an eight-hour work day. (Tr. 322-23.) Dr. Feinberg further opined that plaintiff required a job that allowed for shifting positions from sitting, standing or walking, and that she should never lift/carry objects weighing even less than ten pounds. (Tr. 323.) Dr. Feinberg opined that plaintiff could "occasionally" move her head and "occasionally" hold her head in a static position, but that she should "never" twist, stoop, crouch or squat, or climb ladders or stairs. (Tr. 324.) Dr. Feinberg indicated that plaintiff was likely to miss more than four days per month as a result of her impairments. Id. This report was submitted to and reviewed by the Appeals Council.

**III.     The ALJ's Decision**

The ALJ found that plaintiff had not engaged in substantial gainful activity at any time relevant to the decision, and that she had the medically determinable "severe" impairment of history of stress fractures of the pubic bones. (Tr. 18.) The ALJ found that plaintiff did not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1, Subpart P, Regulations Number 4. (Tr. 19.) The ALJ found that, due to significant inconsistencies in the record as a whole, plaintiff's allegations of total inability to work were incredible. Id.

The ALJ found that plaintiff was unable to perform her past relevant work, but that she retained the residual functional capacity ("RFC") to lift and/or carry 20 pounds occasionally and 10 pounds frequently; sit, stand and/or walk (with usual breaks) for about six hours in an eight hour work day; and push and/or pull without limitation. Id. The ALJ found that this residual functional capacity was consistent with the exertional capacity to perform the full range of light exertional work, and further found that plaintiff was able to make a vocational adjustment to work which existed in significant numbers in the national economy. Id.

In making his RFC findings, the ALJ assigned only nominal weight to the opinions of plaintiff's treating physician, Dr. Feinberg. (Tr. 17.) The ALJ found Dr. Feinberg's records internally inconsistent, inasmuch as Dr. Feinberg endorsed limitations unsupported by the negative objective findings upon

numerous examinations and diagnostic work-up, and also because, although Dr. Feinberg endorsed significant limitations, he specifically stated that plaintiff was capable of working. <u>Id.</u> Similarly, the ALJ afforded only nominal weight to the MERS/Missouri Goodwill Industries vocational evaluation (finding plaintiff unable to work in excess of two-hour shifts) because it was apparently based upon the opinions of Dr. Feinberg. <u>Id.</u>

In evaluating plaintiff's credibility, the ALJ cited <u>Polaski v. Heckler</u>, 739 F.2d 1320 (8th Cir. 1984), and listed the relevant factors therefrom. (Tr. 16.) The ALJ noted that plaintiff's subjective complaints of pain precluding all work exceeded the clinical findings, which consistently documented negative objective findings upon numerous physical examinations and diagnostic tests. <u>Id.</u> The ALJ noted that plaintiff's acknowledged ability to perform a variety of daily activities, including cooking once per day, limited household chores, occasional shopping, and driving, was inconsistent with a finding of total disability. (Tr. 16-17.) The ALJ finally noted that the impairment giving rise to plaintiff's claim of disability was a 2001 pubic fracture, that plaintiff worked for an extended period following the healing of this fracture, and that the record documented no significant deterioration since that time. (Tr. 17.) The ALJ concluded that plaintiff's impairments were not as limiting as she alleged. <u>Id.</u>

Having found plaintiff unable to perform her past relevant work as a fabricator, the ALJ referred to the medical-

vocational guidelines, considered plaintiff's age, education, prior work experience and RFC, and found that the transferability of work skills was immaterial.  (Tr. 18.)  The ALJ concluded that plaintiff was not disabled within the meaning of the Act.  Id.

IV. **Discussion**

To be eligible for Social Security disability benefits under the Social Security Act, a plaintiff must prove his or her disability.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001);  Baker v. Secretary of Health & Human Services, 955 F.2d 552, 555 (8th Cir. 1992).  The Social Security Act defines "disability" in terms of the effect a physical or mental impairment has on a person's ability to function in the workplace.  It provides disability benefits only to persons who are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A).  It further specifies that a person must "not only [be] unable to do his previous work but [must be unable], considering his age, education, and work experience, [to] engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A); Bowen v. Yuckert, 482 U.S. 137, 140 (1987); Heckler v. Campbell, 461 U.S. 458, 459-460 (1983).

To determine whether a claimant is disabled, the Commissioner utilizes a five-step evaluation process. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The Commissioner begins by considering the claimant's work activity. If the claimant is engaged in substantial gainful activity, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe impairment," meaning one which significantly limits his ability to do basic work activities. If the claimant's impairment is not severe, then he is not disabled. The Commissioner then determines whether claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment is equivalent to one of the listed impairments, he is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant has the residual functional capacity to perform his or her past relevant work. If so, the claimant is not disabled. If not, the burden then shifts to the Commissioner to prove that there are other jobs that exist in substantial numbers in the national economy that the claimant can perform. Pearsall, 274 F.3d at 1217, Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000). Absent such proof, the claimant is declared disabled and becomes entitled to disability benefits.

The Commissioner's findings are conclusive upon this Court if they are supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Young v.

Shalala, 52 F.3d 200 (8th Cir. 1995) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)). Substantial evidence is less than a preponderance but enough that a reasonable person would find adequate to support the conclusion. Briggs v. Callahan, 139 F.3d 606, 608 (8th Cir. 1998). To determine whether the Commissioner's decision is supported by substantial evidence, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ;

2. The plaintiff's vocational factors;

3. The medical evidence from treating and consulting physicians;

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments;

5. Any corroboration by third parties of the plaintiff's impairments;

6. The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth the plaintiff's impairment.

Stewart v. Secretary of Health & Human Services, 957 F.2d 581, 585-86 (8th Cir. 1992), quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989).

The Court must also consider any "evidence which fairly detracts from the ALJ's findings." Groeper v. Sullivan, 932 F.2d 1234, 1237 (8th Cir. 1991); see also Briggs, 139 F.3d at 608. However, where substantial evidence supports the Commissioner's

decision, the decision may not be reversed merely because substantial evidence may support a different outcome. _Briggs_, 139 F.3d at 608; _Browning v. Sullivan_, 958 F.2d 817, 821 (8th Cir. 1992), _citing_ _Cruse_, 867 F.2d at 1184.

In the case at bar, plaintiff claims that the ALJ's decision is not based upon substantial evidence on the record as a whole, in part because the ALJ's RFC findings are inconsistent with the Eighth Circuit precedent established in _Singh v. Apfel_, 222 F.3d 448 (8th Cir. 2000) and _Lauer v. Apfel_, 245 F.3d 700, 703 (8th Cir. 2001). In support of this argument, plaintiff claims that the ALJ failed to articulate a legally sufficient rationale for not giving controlling weight to the opinion of Dr. Feinberg, and further submits that such failure was due in part to the ALJ's failure to fully and fairly develop the record inasmuch as he did not re-contact Dr. Feinberg. Plaintiff also contends that the ALJ failed to articulate a legally sufficient rationale, as required by _Polaski_, for discrediting plaintiff's subjective complaints. In particular, plaintiff contends that the ALJ did not properly assess the observations of disinterested third parties - namely the vocational counselors at MERS/Goodwill - who noted plaintiff's absenteeism and pain behavior. Plaintiff finally argues that, because the record establishes the existence of the significant non-exertional impairment of pain, the ALJ's decision was legally insufficient because it lacked vocational expert testimony. In response, the Commissioner argues that the ALJ's decision was based

-29-

upon substantial evidence on the record as a whole.

A.    RFC Determination

As set forth, _supra_, the ALJ in this matter determined that plaintiff's impairments were not of listing-level severity and that, although she was unable to perform her past relevant work, she retained the RFC to perform the full range of light work. Plaintiff claims that her impairments preclude all work.

Residual functional capacity is what a claimant can do despite his limitations. 20 C.F.R. § 404.1545, _Lauer_, 245 F.3d at 703. The ALJ must assess a claimant's RFC based upon all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of his symptoms and limitations. _Anderson v. Shalala_, 51 F.3d 777, 779 (8th Cir. 1995); _Goff v. Barnhart_, 421 F.3d 785, 793 (8th Cir. 2005); 20 C.F.R. §§ 404.1545(a), 416.945(a). A claimant's RFC is a medical question, and there must be some medical evidence, along with other relevant, credible evidence in the record, to support the ALJ's RFC determination. _Id._; _Hutsell v. Massanari_, 259 F.3d 707, 711-12 (8th Cir. 2001); _Lauer_, 245 F.3d at 703-04; _McKinney v. Apfel_, 228 F.3d 860, 863 (8th Cir. 2000). An ALJ's RFC assessment which is not properly informed and supported by some medical evidence in the record cannot stand. _Hutsell_, 259 F.3d at 712. However, although an ALJ must determine the claimant's RFC based upon all relevant evidence, the ALJ is not required to produce evidence and affirmatively prove

that a claimant can lift a certain weight or walk a certain distance.  Pearsall, 274 F.3d at 1217 (8th Cir. 2001); McKinney, 228 F.3d at 863.  The claimant bears the burden of establishing his RFC.  Goff, 421 F.3d at 790.

It is well-settled law that the ALJ is required to ensure a fully and fairly developed record.  Nevland, 204 F.3d 853 (citing Warner v. Heckler, 722 F.2d 428, 431 (8th Cir. 1983)).  Included in this duty is the responsibility of ensuring that the record contains evidence from a treating physician, or at least an examining physician, addressing the particular impairments at issue.  Nevland, 204 F.3d at 858; see Strongson v. Barnhart, 361 F.3d 1066, 1071-72 (8th Cir. 2004).  A reviewing court has the duty of determining whether the record presents medical evidence of the claimant's RFC at the time of the hearing.  Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995).  Unless the record contains such evidence, the ALJ's decision cannot be said to be supported by substantial evidence.  Id.

In this case, the ALJ noted that the injury giving rise to plaintiff's claim of disability was a 2001 pelvic stress fracture, and that, following healing, she had worked steadily until February of 2003.  The ALJ further noted that the record contained no evidence that plaintiff's pelvic condition had worsened.  A condition that was present but not disabling during working years and has not worsened cannot be used to prove a present disability.  See Orrick v. Sullivan, 966 F.2d 368, 370

(8th Cir. 1992) (per curiam); <u>Dixon v. Sullivan</u>, 905 F.2d 237, 238 (8th Cir. 1990).

The ALJ thoroughly analyzed and discussed the medical evidence of record. Specifically, the ALJ noted plaintiff's treatment with Dr. Chow for care relative to bilateral hip pain, and found it significant that Dr. Chow noted no significant objective findings, and that radiographs of plaintiff's bilateral hips were interpreted as negative. The ALJ noted plaintiff's treatment with Dr. Strickland, who objectively noted plaintiff's full and pain free range of motion of the bilateral hips, and also noted normal findings upon neurological examination of the lower extremities. The ALJ observed that Dr. Strickland, after finding radiographic evidence of a healing stress fracture, recommended plaintiff submit to bone density and bone scan evaluations, and that both evaluations were largely unremarkable. The ALJ noted Dr. Strickland's conclusion that he was unable to establish the etiology of plaintiff's pain.

The ALJ also discussed the records of Dr. Burdge, who observed no orthopedic cause for plaintiff's pain upon MRI evaluation and physical exam, and who also concluded there was no known etiology of plaintiff's pelvic/groin pain. Finally, the ALJ noted plaintiff's consultative examination with Dr. Tippett, who noted subjective complaints but found no significant objective findings upon either physical or radiograph evaluation, and who concluded that plaintiff's complaints had no determinable etiology.

-32-

Following his analysis of the medical evidence, the ALJ concluded that it was significant that the results of plaintiff's physical examinations and diagnostic tests were consistently negative, and that the medical evidence of record provided no support for her allegations of disability. Johnson v. Chater, 87 F.3d 1015, 1017-18 (8th Cir. 1996) (it is proper for an ALJ to consider the lack of reliable medical opinions to support a claimant's allegations of a totally disabling condition; in fact, the is was noted to be the "strongest support" in the record for the ALJ's determination).

The ALJ further found it significant that plaintiff acknowledged her ability to engage in a variety of daily activities, including attending to her own personal care and some of the care and upkeep of her home. The ALJ noted that these abilities, while not dispositive, were inconsistent with a finding of total disability. Wilson v. Chater, 76 F.3d 238, 241 (8th Cir. 1996) (although daily activities alone do not disprove disability, they are a factor to consider in evaluating subjective complaints); Haynes v. Shalala, 26 F.3d 812, 814-15 (8th Cir. 1994) (ALJ may consider daily activities inconsistent with subjective complaints).

In addition, the undersigned notes that plaintiff did not regularly take strong prescription pain medication. Although plaintiff testified that she sought to avoid taking Tramadol due to side effects, the record reveals that plaintiff had previously indicated to the vocational counselors at MERS/Goodwill that

Tramadol caused no side effects. <u>See</u> (Tr. 145, 338.) Furthermore, it does not appear that plaintiff complained of side effects to her physicians. <u>See</u> <u>Ownbey v. Shalala</u>, 5 F.3d 342, 345 (8th Cir. 1993) (per curiam) (claimant's allegations of medication-related dizziness, drowsiness, and sleepiness were inconsistent with record, as he had never complained to physicians about alleged side effects). The Eighth Circuit has held that the lack of strong pain medication is inconsistent with a finding of disability. <u>Haynes</u>, 26 F.3d at 814.

Finally, the undersigned further notes that plaintiff was treated conservatively by all of her physicians. Conservative or minimal medical treatment militates against a finding of disability. <u>Loving v. Department of Health and Human Services, Secretary</u>, 16 F.3d 967, 970 (8th Cir. 1994).

The undersigned next addresses plaintiff's contention that the ALJ erred by failing to give controlling weight to the opinion of Dr. Feinberg, plaintiff's treating physician. Ordinarily, a treating physician's opinion is entitled to substantial weight. <u>Singh</u>, 222 F.3d 448. A treating physician's opinion will be granted controlling weight, provided it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record. <u>Singh</u>, 222 F.3d at 452, <u>citing</u> <u>Kelley v. Callahan</u>, 133 F.3d 583, 589 (8th Cir. 1998.) This is so because a treating source has the best opportunity to observe and

evaluate a claimant's condition,

> since these sources are likely to be the
> medical professionals most able to provide a
> detailed, longitudinal picture of [a
> claimant's] medical impairment(s) and may
> bring a unique perspective to the medical
> evidence that cannot be obtained from the
> objective medical findings alone or from
> reports of individual examinations, such as
> consultative examinations or brief
> hospitalizations.

20 C.F.R. § 404.1527(d)(2).

However, "[a]lthough a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as whole." Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001). Furthermore, the Eighth Circuit has noted that, when a treating physician's notes are inconsistent with his or her residual functional capacity assessment, such residual functional capacity assessment is not entitled to controlling weight. Pirtle v. Astrue, 479 F.3d 931, 933 (8th Cir. 2007) (citing Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006)). The Commissioner considers various factors in determining the weight to afford a treating physician's opinion, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, whether the treating source provides support for his findings, the treating source's area of specialty, and whether the other evidence of record is consistent with the treating source's findings. See 20 C.F.R. § 404.1527(d). The Regulations further provide that the

Commissioner "will always give good reasons . . . for the weight [given to the] treating source's opinion." Id. An ALJ is entitled to discredit the opinion of a treating physician when it merely consists of vague and conclusory statements, Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001); or when it is inconsistent with the balance of the objective medical evidence in the record, Choate v. Barnhart, 457 F.3d 865, 870 (8th Cir. 2006).

In this case, after evaluating the record as a whole, the ALJ placed only nominal weight on the March 1, 2004 work capability report completed by Dr. Feinberg. In explaining his reasoning, the ALJ noted that Dr. Feinberg's report was internally inconsistent. The ALJ noted that, although Dr. Feinberg therein endorsed significant limitations, including the inability to sit, stand or walk more than two hours in an eight-hour workday, Dr. Feinberg concluded by stating that plaintiff was capable of working. Furthermore, as the Commissioner notes, the restrictions Dr. Feinberg endorses in his March 2004 work capability form are inconsistent with those endorsed just one month earlier, and there is no evidence that plaintiff's condition worsened during this period. Specifically, on February 9, 2004, Dr. Feinberg opined that plaintiff's functional limitations were limited to no lifting over 25 pounds, no stairs, no pushing or pulling, and the need to change positions hourly. (Tr. 155.) On February 25, 2004, Dr. Feinberg advised plaintiff to get a sedentary job. (Tr. 154.) These are adequate reasons for the ALJ to discount Dr. Feinberg's

-36-

opinion.  See Hogan, 239 F.3d at 961; Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000) (ALJ may discount or disregard a treating physician's opinion if that physician offers inconsistent opinions); Cruze v. Chater, 85 F.3d 1320, 1324-25 (8th Cir. 1996) (ALJ properly discredited opinion of treating physician who rendered inconsistent opinions, finding that such inconsistency undermined credibility).

The ALJ further noted that Dr. Feinberg's opinion was inconsistent with the balance of the medical evidence of record, in which, as discussed, supra, plaintiff's medical treatment providers consistently documented negative objective findings upon numerous physical examinations, and in diagnostic work-up.  See Choate, 457 F.3d at 870 (ALJ properly discredited treating cardiologist's conclusion that claimant was disabled because it was conclusory and unsupported by the balance of the objective medical evidence of record); Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997) (ALJ's decision to discount treating physician's opinion upheld where other medical assessments in the record were supported by better or more thorough medical evidence).  Substantial evidence supports the ALJ's decision to discredit Dr. Feinberg's opinion.

B.    Fully and Fairly Develop the Record

Plaintiff next argues that the ALJ's decision is not supported by substantial evidence because the ALJ failed to fully and fairly develop the record inasmuch as he did not re-contact Dr. Feinberg.  It is the ALJ's duty to fully and fairly develop the

record, even when, as in this case, the claimant is represented by counsel. Snead v. Barnhart, 360 F.3d 834, 836-37 (8th Cir. 2004); see Freeman v. Apfel, 208 F.3d 687, 692 (8th Cir. 2000). Included in this duty is the responsibility of ensuring that the record contains evidence from a treating physician, or at least an examining physician, addressing the particular impairments at issue. Nevland, 204 F.3d at 858; see Strongson, 361 F.3d 1066; Haley v. Massanari, 258 F.3d 742 (8th Cir. 2001). "Unfairness or prejudice resulting from an incomplete record -- whether because of lack of counsel or lack of diligence on the ALJ's part -- requires a remand." Highfill v. Bowen, 832 F.2d 112, 115 (8th Cir. 1987); citing Kane v. Heckler, 731 F.2d 1216, 1220 (5th Cir. 1984).

The Regulations provide that the ALJ should re-contact a treating physician in some circumstances, such as when the information the physician provides is inadequate for the ALJ to determine whether the claimant is actually disabled. 20 C.F.R. § 404.1512(e) ("When the evidence we receive from your treating physician ... is inadequate for us to determine if you are disabled ... [w]e will ... recontact your treating physician ... to determine whether the additional information we need is readily available."). The regulations do not require an ALJ to re-contact a treating physician whose opinion was inherently contradictory or unreliable. This is especially true when the ALJ is able to determine from the record whether the applicant is disabled. See Sultan v. Barnhart, 368 F.3d 857, 863 (8th Cir. 2004) (ALJ is not

-38-

required to re-contact a treating physician when the ALJ is able to determine from the record whether the applicant is disabled).

In this case, the issue is not whether Dr. Feinberg's opinion was somehow incomplete. The ALJ properly found that Dr. Feinberg's opinion was inconsistent with itself, and that it was refuted by the balance of the medical evidence in the record. Under these circumstances, the ALJ was under no obligation to re-contact Dr. Feinberg. See Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) (ALJ's duty to develop record during social security disability proceedings did not extend to asking treating physicians for more information because there was no lack of clarity or foundation, no crucial issue was undeveloped, and several examining physicians provided detailed clinical data and observations about claimant's limitations).

Of further note are the additional materials submitted to and reviewed by the Appeals Council; namely Dr. Feinberg's September 12, 2005 physical residual functional capacity questionnaire; plaintiff's letter, and the August 9, 2005 letter from plaintiff's attorney. (Tr. 2, 315-326.) When new evidence is submitted and considered by the Appeals Council, the reviewing court must determine "whether there is substantial evidence in the administrative record, which now includes the new evidence, to support the ALJ's decision." Richmond v. Shalala, 23 F.3d 1441, 1444 (8th Cir. 1994), citing Nelson v. Sullivan, 966 F.2d 363, 366 (8th Cir. 1992); See also Frankl v. Shalala, 47 F.3d 935, 938-39

(8th Cir. 1995). This requires the reviewing court to engage in the "peculiar task" of essentially speculating on how the ALJ would have weighed the new evidence. <u>Riley v. Shalala</u>, 18 F.3d 619, 622 (8th Cir. 1994).

After review of the ALJ's decision, supplemented by the additional evidence submitted to the Appeals Council, the undersigned finds that the ALJ's decision is supported by substantial evidence on the record as a whole. Because Dr. Feinberg's questionnaire essentially reiterates the same opinions that the ALJ properly considered and discredited as discussed, <u>supra</u>, the undersigned concludes that Dr. Feinberg's questionnaire would not have changed the ALJ's decision to deny benefits. <u>See</u> <u>Riley</u>, 18 F.3d at 623; <u>Nelson</u>, 966 F.2d at 366-67.

A review of the ALJ's disability determination and his RFC findings reveals that he properly exercised his discretion and acted within his statutory authority in evaluating the evidence on the record as a whole. The ALJ based his decision on all of the relevant, credible evidence of record, properly discredited Dr. Feinberg's opinion after conducting the proper analysis, and ensured that the record was fully and fairly developed. For the foregoing reasons, the undersigned finds that the ALJ's disability determination and RFC findings are based upon substantial evidence on the record as a whole. <u>See</u> 20 C.F.R. § 404.1520a; <u>see also</u> <u>Jones v. Callahan</u>, 122 F.3d 1148 (8th Cir. 1997) (substantial evidence supported ALJ's determination that claimant did not have

a severe impairment when claimant was not regularly taking medications, was not under active medical treatment, and where claimant's daily activities were not restricted).

C. <u>Credibility Determination</u>

The ALJ in this matter determined that plaintiff's subjective complaints of pain precluding all work were not credible. Plaintiff argues that this decision runs afoul of the Eighth Circuit precedent established in <u>Polaski</u>. The undersigned disagrees.

"A claimant has the burden of proving that his disability results from a medically determinable physical or mental impairment." <u>Polaski</u>, 739 F.2d at 1321. However, testimony regarding pain is necessarily subjective in nature, as it is the Plaintiff's own perception of the effects of his alleged physical impairment. <u>Id.</u>; <u>Halpin v. Shalala</u>, 999 F.2d 342, 346 (8th Cir. 1993). Because of the subjective nature of physical symptoms, and the absence of any reliable technique for their measurement, it is difficult to prove, disprove or quantify their existence and/or overall effect. <u>Id.</u> at 1321-22. The Eighth Circuit addressed this difficulty in <u>Polaski</u>, and established the following standard for the evaluation of subjective complaints:

> "The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to

subjective complaints, including the
claimant's prior work record, and observations
by third parties and treating and examining
physicians relating to such matters as: (1)
the claimant's daily activities; (2) the
duration, frequency and intensity of the pain;
(3) precipitating and aggravating factors; (4)
dosage, effectiveness and side effects of
medication; (5) functional restrictions."

Id. at 1322.

Although the ALJ is not free to accept or reject the
claimant's subjective complaints based upon personal observations
alone, he or she may discount such complaints if there are
inconsistencies in the evidence as a whole. Id. The "crucial
question" is not whether the claimant experiences symptoms, but
whether his credible subjective complaints prevent him from
working. Gregg v. Barnhart, 354 F.3d 710, 713-14 (8th Cir. 2003).
When an ALJ explicitly considers the Polaski factors and discredits
a claimant's complaints for a good reason, that decision should be
upheld. Hogan, 239 F.3d at 962. The credibility of a claimant's
subjective testimony is primarily for the ALJ, not the courts, to
decide, and the court considers with deference the ALJ's decision
on the subject. Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir.
2005).

In the instant matter, the ALJ specifically cited
Polaski, and stated that he had considered the factors therefrom in
making his credibility determination. The ALJ concluded that,
while plaintiff's impairments may create certain pain and

discomfort, the record as a whole did not support a finding that plaintiff's impairments were as limiting as she alleged. The ALJ then set forth numerous inconsistencies in the record to support his conclusion.

As discussed in detail, <u>supra</u>, the ALJ noted the obvious lack of any clinical evidence in the record to explain the level of pain plaintiff alleged, restating his observations that physical examination and diagnostic work-up consistently revealed normal findings. The Eighth Circuit has recognized that an ALJ is bound to accept "alleged functional limitations and restrictions due to pain and other symptoms" only to the extent that they can "reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence." <u>Randolph v. Barnhart</u>, 386 F.3d 835, 842 (8th Cir. 2004) (citing 20 C.F.R. §§ 404.1529(a) and 929(a)); <u>Cruse</u>, 867 F.2d at 1186 (citing <u>Ward</u>, 786 F.2d at 847)) (while not dispositive, an ALJ may properly consider the lack of objective medical evidence to support the degree of severity of alleged pain).

The ALJ also found it significant that plaintiff acknowledged her ability to attend to her own self-care, and to engage in a variety of daily household activities, including some cooking, dishes, laundry, making beds and changing sheets, vacuuming, sweeping, and taking out trash. The ALJ also noted that plaintiff testified that she shopped on occasion, and was able to drive. Furthermore, the undersigned notes that plaintiff testified

that she visits a sick friend in his home once per week, and also regularly visits her daughter and her parents. Activities such as these are inconsistent with allegations of total disability. <u>See</u> <u>Lawrence v. Chater</u>, 107 F.3d 674, 676 (8th Cir. 1997) (plaintiff dressed and bathed herself, and did some housework, cooking and shopping); <u>Pena v. Chater</u>, 76 F.3d 906, 908 (8th Cir. 1996) (driving when unable to find a ride and sometimes going to the grocery store); <u>Nguyen v. Chater</u>, 75 F.3d 429 (8th Cir. 1996) (visiting others, cooking own meals, doing own laundry and attending church); <u>Novotny v. Chater</u>, 72 F.3d 669, 671 (8th Cir. 1995) (carrying in grocery bags, carrying out garbage, driving wife to and from work inconsistent with extreme, disabling pain); <u>Shannon v. Chater</u>, 54 F.3d 484, 487 (8th Cir. 1995) (plaintiff cooked breakfast, "sometimes" needed help with household cleaning and other chores, visited friends and relatives); <u>Woolf</u>, 3 F.3d at 1213 (plaintiff drove, shopped for groceries and did housework with some help from neighbor).

As noted, <u>supra</u>, the ALJ also noted that plaintiff worked for an extended period following the healing of her pubic bone fracture, and that the record contained no evidence that there had been a significant deterioration of plaintiff's condition since that time. The ALJ concluded that, absent evidence of significant deterioration, plaintiff's condition could not be considered disabling. <u>Goff</u>, 421 F.3d at 793; <u>Orrick</u>, 966 F.2d at 370 (when a claimant has worked with an impairment over a period of years and

there is no evidence of significant deterioration, such impairment cannot be considered disabling at present).

Furthermore, as the Commissioner correctly notes, plaintiff continually sought work during the period she alleges she was disabled, as evidenced by her statements to Dr. Feinberg that she was looking for a job. (Tr. 153, 154, 157.) This is an indication that plaintiff's pain is not as disabling as she alleges. Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995) (claimant's record of contemplating work indicated that he did not view his pain as disabling); Dunahoo v. Apfel, 241 F.3d 1033, 1038-39 (8th Cir. 2001) (seeking work while applying for benefits is inconsistent with complaints of disabling pain); Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994) (claimant's statements that he was seeking work were inconsistent with a finding of disability). Finally, as noted, supra, plaintiff's course of medical treatment was conservative, and she did not regularly take strong prescription pain medication. Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998) (conservative medical treatment is inconsistent with allegations of disabling pain); Haynes, 26 F.3d at 814 (a lack of strong pain medication was inconsistent with allegations of disabling pain).

Plaintiff also alleges error inasmuch as the ALJ failed to properly consider the observations of the MERS/Goodwill vocational counselors who noted plaintiff's pain behavior and absenteeism. However, Polaski specifically states that the

-45-

observations of "third parties **and** treating and examining physicians" are to be considered. <u>Polaski</u>, 739 F.2d at 1322 (emphasis added). Here, while the vocational counselors noted that plaintiff appeared uncomfortable and often left early, plaintiff's treating and examining physicians offered conflicting observations, such as observing plaintiff to be in no apparent or acute distress (Tr. 167, 246, 296); observing plaintiff to get on and off the examination table without difficulty (Tr. 167, 137); and rise from a chair without significant difficulty. (Tr. 300.) Even when the evidence of record may lead to inconsistent conclusions, the ALJ's decision must be upheld if it is supported by substantial evidence on the record as a whole. <u>Guilliams v. Barnhart</u>, 393 F.3d 798, 801 (8th Cir. 2005).

Plaintiff also contends that the ALJ improperly discredited the evidence from MERS/Goodwill that plaintiff was unable to perform full-time work activity because she could only work two-hour shifts. As the Commissioner correctly notes, this is not a medical opinion, and was also apparently based upon the opinion of Dr. Feinberg which, as discussed, <u>supra</u>, the ALJ properly discredited. The undersigned therefore concludes that the ALJ's treatment of the evidence from MERS/Goodwill was proper.

A review of the ALJ's decision shows that, in a manner consistent with and as required by <u>Polaski</u>, the ALJ considered plaintiff's subjective complaints on the basis of the entire record

before him, and set out numerous inconsistencies detracting from plaintiff's credibility. The ALJ may disbelieve subjective complaints when there are inconsistencies in the record as a whole. Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). Because the ALJ's credibility determination is supported by good reasons and substantial evidence, this Court is required to give it deference. Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992); Hogan, 239 F.3d at 962.

D.    Non-exertional impairments

In this case, the ALJ relied upon the Medical-Vocational Guidelines ("Guidelines") to direct a finding that plaintiff was not disabled. Plaintiff contends that the ALJ's decision is not supported by substantial evidence because her pain is a significant non-exertional impairment, and the ALJ was thus required to obtain vocational expert testimony.

When an ALJ determines, as here, that a claimant is unable to return to his past relevant work, the burden shifts to the Commissioner to show that the claimant is able to engage in work that exists in the national economy. Harris v. Shalala, 45 F.3d 1190, 1194 (8th Cir. 1995), citing Sanders v. Sullivan, 983 F.2d 822, 823 (8th Cir. 1992). When only exertional impairments are present, the Commissioner may meet this burden by relying on the Guidelines. Bolton v. Bowen, 814 F.2d 536, 537 n.3 (8th Cir. 1987). In the presence of non-exertional impairments, however, the ALJ may rely upon the Guidelines only if he or she makes a finding,

supported by the record, that "the non-exertional impairment does not significantly diminish Plaintiff's residual functional capacity to perform the full range of activities listed in the Guidelines." Harris, 45 F.3d at 1194 (citing Thompson v. Bowen, 850 F.2d 346, 349-50 (8th Cir. 1988)). Absent such a finding, the Guidelines do not control, and the ALJ must call a vocational expert or produce other similar evidence to establish that there are jobs available in the national economy for a person with the claimant's abilities. Harris, 45 F.3d at 1194; Sanders, 983 F.2d at 823; Thompson, 850 F.2d at 350. The Eighth Circuit has provided some guidance in applying this standard:

> In this context "significant" refers to whether the claimant's non-exertional impairment or impairments preclude the claimant from engaging in the full range of activities listed in the Guidelines under the demands of day-to-day life. Under this standard isolated occurrences will not preclude use of the Guidelines, however persistent non-exertional impairments which prevent the claimant from engaging in the full range of activities listed in the Guidelines will preclude the use of the Guidelines to direct a conclusion of disabled or not disabled. For example, an isolated headache or temporary disability will not preclude the use of the Guidelines whereas persistent migraine headaches may be sufficient to require more than the Guidelines to sustain the [Commissioner's] burden.

Thompson, 850 F.2d at 350.

Pain is a non-exertional impairment, Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998), and is the only non-exertional

-48-

impairment alleged herein.  Here, as discussed in detail, <u>supra</u>, the ALJ explicitly discredited plaintiff's subjective allegations of pain, and gave legally sufficient reasons for doing so.  "Use of the Guidelines is appropriate if the ALJ explicitly discredits subjective allegations of pain for a legally sufficient reason, such as inconsistencies in the record."  <u>Bolton</u>, 814 F.2d at 538; <u>see also</u> <u>Reynolds v. Chater</u>, 82 F.3d 254, 258-59 (8th Cir. 1996); <u>Carlock v. Sullivan</u>, 902 F.2d 1341, 1343 (8th Cir. 1990); <u>Cruse</u>, 867 F.2d at 1187.  The ALJ's use of the Guidelines was therefore appropriate.

A review of the ALJ's decision reveals that he properly exercised his discretion and acted within his statutory authority in evaluating the evidence on the record as a whole.  The ALJ ensured that the record was fully and fairly developed, and based his disability and RFC determinations on all of the relevant, credible evidence of record.  The additional evidence submitted to and reviewed by the Appeals Council would not have changed the ALJ's decisions.  The ALJ also properly discredited plaintiff's subjective complaints after undertaking the proper analysis, and properly relied upon the Guidelines to direct a finding of not disabled.

Therefore, for all of the foregoing reasons, the undersigned recommends a finding that the Commissioner's decision is supported by substantial evidence on the record as a whole.

Because there is substantial evidence to support the Commissioner's decision, this Court may not reverse the decision merely because substantial evidence may support a different outcome, or because another court could have decided the case differently. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001); Browning, 958 F.2d at 821. Accordingly, the decision of the Commissioner in denying plaintiff's claims for benefits should be affirmed.

Therefore, for all of the foregoing reasons,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be affirmed, and that plaintiff's Complaint be dismissed with prejudice.

The parties are advised that they have eleven days in which to file written objections to this Report and Recommendation. Failure to timely file objections may result in waiver of the right to appeal questions of fact. Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

_Frederick R. Buckles_
UNITED STATES MAGISTRATE JUDGE

Dated this 14th day of May, 2007.